**ROCKY MOUNTAIN FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C78–177K.**

United States District Court, D. Wyoming.

Aug. 1, 1979.

W. Perry Dray, Cheyenne, Wyo., for plaintiff.

Jeffrey A. King, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

The above-entitled matter coming on regularly for trial before the Court sitting without a jury, and the Court having heard the arguments of counsel and having carefully read the memoranda briefs and the stipulation of facts, and having examined the exhibits, and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This is an action for the refund of federal income taxes and interest paid and arises under the provisions of 28 U.S.C. § 1346(a)(1), 26 U.S.C. § 7422(a) and 28 U.S.C. § 1340.

2. On April 4, 1978, the Internal Revenue Service (Service) assessed against First Laramie Savings and Loan Association (First Laramie) a deficiency in declaration and payment of income taxes for the tax period ending April 30, 1974. The total amount of said assessment, including interest, was $128,474.02.

3. Plaintiff Rocky Mountain Federal Savings and Loan Association, formerly Cheyenne Federal Savings and Loan Association (Cheyenne Federal) paid said assessment in full on or about May 5, 1978.

4. Plaintiff filed a claim for refund, as provided by law, with the District Director of the Internal Revenue Service at Cheyenne, Wyoming on May 5, 1978 seeking a refund for such taxes and interest, alleging such income taxes were erroneously com-

puted resulting in the over-assessment and over-payment by plaintiff of such tax.

5. The Service refused to grant any part of the refund requested and on July 18, 1978, the District Director for the Internal Revenue Service Center, Ogden, Utah, mailed to plaintiff a Notice of Disallowance of such claim.

6. The said assessment arose out of a merger between First Laramie and Cheyenne Federal and the determination by the Service that the same was not a tax-free reorganization within the purview of Section 368 of the Internal Revenue Code of 1954, (26 U.S.C.). As a basis for asserting such deficiency, the government alleged that Cheyenne Federal (the resulting corporation), as transferee of the assets of First Laramie (the merging corporation), must report First Laramie's bad debt reserve as income.

7. First Laramie's bad debt reserve need not be reported as income by Cheyenne Federal if the merger of First Laramie into Cheyenne Federal qualifies as a tax-free reorganization under § 368 I.R.C., 1954.

8. The overall question presented by this case is whether the transfer by a state-chartered guaranty capital savings and loan association (First Laramie) of all its assets and liabilities to a federally-chartered, non-stock mutual savings and loan association (Cheyenne Federal) constituted a § 368(a)(1)(A) I.R.C., 1954, tax-free reorganization and that therefore First Laramie was not required to restore the balance of its bad debt reserve to gross income in its final taxable year.

9. In order to resolve the overall question in this case, it is necessary to dispose of two underlying issues:

a. Do the savings passbook and certificate accounts of Cheyenne Federal constitute "voting stock" of Cheyenne Federal within the meaning of § 368(a), I.R.C., 1954; and

b. Does the transaction under consideration satisfy the continuity of interest requirement of such tax-free reorganization as set out in 12 C.F.R. § 1.368–1(b).

10. First Laramie was incorporated under the laws of the State of Wyoming as a state-chartered, guaranty capital stock savings and loan association, and was authorized to raise its permanent capital by issuing capital stock. First Laramie issued 1,500 shares of $100.00 par value capital stock.

The capital stock issued by First Laramie was nonwithdrawable and could not be redeemed until all of its other liabilities, including savings accounts, were fully liquidated upon final dissolution of the Association.

Stockholders of First Laramie were entitled to vote on matters affecting the Association, to receive dividends, and to share in the assets upon liquidation or dissolution of the Association.

11. In addition to the capital stockholders, First Laramie has savings depositors. The savings depositors' accounts of First Laramie were insured by the Federal Savings and Loan Insurance Corporation and were redeemable at face value within thirty days after a request had been filed with the Association. As a practical matter, however, savings depositors were paid the face value of their accounts upon demand. Savings depositors of First Laramie had the right to earn interest on their savings accounts. First Laramie was a cash basis taxpayer.

12. Cheyenne Federal was incorporated under the laws of the United States as a mutual, federal savings and loan association chartered by the Federal Home Loan Bank Board under § 5 of the Homeowners Loan Act of 1933, as amended, Cheyenne Federal's charter (Charter K, revised) was issued by the Board of 1935. Under Charter K, a federal savings and loan association may raise its capital by accepting payments on an unlimited number of savings accounts. It may not, however, issue capital stock. Cheyenne Federal has never issued stock.

13. Savings depositors at Cheyenne Federal are members of the Association. A member of Cheyenne Federal is entitled to one vote for every $100.00, or fraction thereof in his account, but may not cast more than 50 votes in any event.

Members of Cheyenne Federal are entitled to nominate and elect the Association's Board of Directors, to assign proxies, to approve changes in the Association's charter and by-laws, to meet annually, to share pro rata in distributions of earnings and surplus funds, and to share in liquidation proceeds.

The savings depositors' accounts in Cheyenne Federal were insured by the Federal Savings and Loan Insurance Corporation and were redeemable at face value within 30 days after a request had been filed with the Association. As a practical matter, however, savings depositors were paid the face value of their accounts upon demand.

14. Under federal law, the only proprietary interests available in Cheyenne Federal are savings accounts.

15. Cheyenne Federal was a cash basis taxpayer.

16. On October 10, 1973, Cheyenne Federal and First Laramie entered into a merger agreement and, following approval by all appropriate parties, the merger became effective April 30, 1974. The plan of merger was approved by the Board of Directors of Cheyenne Federal, was agreed to by the Board of Directors and stockholders of First Laramie, and was approved by the Federal Home Loan Bank Board and the state examiner for the State of Wyoming.

17. Under the plan of merger, First Laramie's savings depositors exchanged their passbooks in First Laramie for passbooks of equivalent value in Cheyenne Federal and became members of Cheyenne Federal. Each outstanding share of First Laramie capital stock, with a par value of $100.00, was exchanged for a savings deposit account in Cheyenne Federal with a value of $616.15. The former stockholders of First Laramie also became members of Cheyenne Federal. After the merger, the former savings depositors and stockholders of First Laramie became entitled to all of the rights vested in members of Cheyenne Federal.

In accordance with Wyoming law, the capital stock of First Laramie was then surrendered and cancelled. Cheyenne Federal acquired all the assets and succeeded to all the liabilities, including loans secured by real property, of First Laramie.

18. One year after the merger, 89% of the savings accounts and certificates of Cheyenne Federal issued for the permanent shares of First Laramie were still held by the same persons and, as of December 31, 1976, in excess of 80% of the savings accounts and certificates of Cheyenne Federal issued for permanent shares of First Laramie were still retained by the same persons.

19. After the merger, Cheyenne Federal continued in the savings and loan business at the same locations that it and First Laramie previously occupied with essentially the same depositors and the same borrowers.

20. Any savings and loan association insured by Federal Savings and Loan Insurance Corporation is required to create and maintain a bad debt reserve.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action and the parties under 28 U.S.C. § 1346(a)(1), 28 U.S.C. § 1340 and 26 U.S.C. § 7422(a).

2. The First Laramie stockholders received all the rights that could be given them under the law governing federally chartered savings and loan associations. Both the First Laramie stockholders and depositors received passbook accounts in Cheyenne Federal which entitled them to vote, to share in any distribution of earnings, and to share in liquidation proceeds.

The Internal Revenue Code of 1954 § 7701(a)(7) provides that the term "stock" includes "shares in an association". The decision of the Tenth Circuit relied on herein states:

"Granted that such shares have some of the indicia of a creditor-debtor relationship, nevertheless at the same time such shares also possess many of the attributes of a proprietary interest such as right to vote and thereby participate in management, so-called bonus payments (in addi-

tion to interest) contingent on the association's earnings, shareholders' right to share in liquidation proceeds, and the like." *Everett v. U. S.*, 448 F.2d 357 (10th Cir. 1971).

In a similar factual setting, the Sixth Circuit in *West Side Fed. S & L Ass'n of Fairview Park v. U. S.*, 494 F.2d 404, 411 (6th Cir. 1974) concluded:

. . . Since a savings account is the only proprietary interest available in a federal mutual savings and loan association and the former shareholders of Parma Savings Company received such accounts in exchange for their stock, it is improper to ignore the proprietary rights included in what they received and concentrate only on their rights as creditors . . . The courts do not conduct an examination to determine whether the shareholder of the merged corporation receives more or less of a proprietary interest than he surrendered. Instead, it is an analysis to determine if a proprietary interest is received, and the fact that what is received may be a mixture of proprietary interests and debt instruments of the acquiring corporation is not alone determinative.

Under the above analyses, the savings and certificate accounts of Cheyenne Federal constitute "voting stock" of Cheyenne Federal within the meaning of § 368(a) IRC, 1954.

3. The continuity of interest test set out in 12 CFR § 1.368–1(b) has been met due to the following circumstances: (1) 100% of the permanent stockholders and savings account holders of First Laramie converted their holdings to Cheyenne Federal pursuant to the plan of merger; (2) one year after the merger, 89% of the savings accounts and certificates of Cheyenne Federal issued for the permanent shares of First Laramie were still held by the same persons; (3) as of December 31, 1976, in excess of 80% of the savings accounts and certificates of Cheyenne Federal issued for permanent shares of First Laramie were still retained by the same persons; and (4) Cheyenne Federal continued in the savings and loan business at the same locations that it and First Laramie previously occupied with essentially the same depositors and the same borrowers.

4. The exchange of First Laramie permanent stock for savings accounts in Cheyenne Federal, which accounts contained all the proprietary interest available to members of Cheyenne Federal, resulted in a continuity of proprietary interest. Therefore, this is a tax-free reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1954. First Laramie is not required to return its bad debt reserve to income during the last taxable year.

5. The assessment and collection by the Internal Revenue Service of income taxes and interest thereon in the amount of $101,670.00 and $26,567.57, respectively, was erroneous and illegal.

6. Plaintiff has overpaid its liabilities for income taxes and interest thereon for the last taxable year of First Laramie and is entitled to recover from defendant the sum of $128,237.57 plus interest provided by law from the date of payment of that said amount.

Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.